UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA

RARE BREED TRIGGERS,
LLC, a North Dakota Limited
Liability Company,

      Plaintiff,                      CASE NO.:

v.

MERRICK GARLAND, in his
official capacity as Attorney
General of the United States; U.S.
DEPARTMENT OF JUSTICE;
BUREAU OF ALCOHOL,
TOBACCO, FIREARMS AND
EXPLOSIVES; MARVIN RICHARDSON,
in his official capacity as Acting Director,
Bureau of Alcohol, Tobacco, Firearms,
and Explosives,

      Defendants.

_____/

## COMPLAINT FOR VACATUR OF UNLAWFUL AGENCY RULE AND RELATED ALLEGED FINAL AGENCY ACTION, AND DECLARATORY RELIEF

The Plaintiff, RARE BREED TRIGGERS, LLC, a North Dakota Limited Liability Company ("RBT"), by and through its undersigned counsel, hereby sues the Defendants, MERRICK GARLAND, in his official capacity as Attorney General of the United States ("AG"), U.S. DEPARTMENT OF JUSTICE ("DOJ"), BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES ("ATF"), and MARVIN RICHARDSON, in his official capacity as Acting Director, Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF DIRECTOR"), (collectively "Defendants"), and as grounds therefore states as follows:

**Parties, Jurisdiction and Venue**

1.      The Court has jurisdiction over this action pursuant to 5 U.S.C. §§ 701-706 (Administrative Procedure Act ("APA")), 28 U.S.C. § 1331 (arising under the laws of the United States), and 28 U.S.C. § 1346 (United States as a Defendant).

2.      This Court has authority to grant the remedy RBT seeks under 28 U.S.C. §§ 2201 and 2202 and 5 U.S.C. § 706, or alternatively pursuant to federal common law.

3.      Venue is proper in this district pursuant to 5 U.S.C. § 703 and 28 U.S.C. § 1391(e).

4.      RBT is a North Dakota limited liability company with its current principal place of business located at 3523 45th Street, Suite 100 Fargo, North Dakota 58104, and which is otherwise *sui juris*.

5.      AG is exercising the powers of the Attorney General of the United States, and as such has been delegated certain authority by federal law to promulgate rules and regulations to carry out the provisions of the National Firearms Act of 1934 ("NFA") and the Gun Control Act of 1986 ("GCA"). See 18 U.S.C. § 926; 26 U.S.C. § 7805(a). AG is the head of the DOJ.

6.      DOJ is an executive agency within the federal government of the United States. DOJ is headquartered at 950 Pennsylvania Avenue NW, Washington, D.C. 20530.  DOJ, together with ATF, is responsible for the administration and enforcement of the National Firearms Act and the Gun Control Act.

7.      ATF is a component of the DOJ, and is headquartered at 99 New York Avenue NE, Washington, D.C. 20226.  ATF, together with DOJ, is responsible for the administration and enforcement of the National Firearms Act and the Gun Control Act.  AG has designated ATF to act on his behalf with respect to firearms.  28 C.F.R. § 0.130(a)(1)-(2).

8.      ATF DIRECTOR is responsible for overseeing ATF's enforcement of the laws at issue in this case.

### Basic Overview of Dispute and RBT's Claims

9.      RBT holds, in perpetuity, the exclusive right to market and sell the patented FRT-15 semiautomatic trigger, which is designed for use in certain semiautomatic rifles.  In short, the FRT-15 is a forced reset trigger, and there are other forced reset triggers on the market.  Generally, forced reset triggers, including the FRT-15, force mechanical reset of the trigger into the trigger forward, ready to fire position, allowing for quicker follow up shots.

10.     RBT started nationwide sale of the FRT-15 in December 2020 through its own website (www.rarebreedtriggers.com), the websites of third-party vendors, and in third-party vendors' brick and mortar stores.

11.     On July 26, 2021, RBT's general counsel and owner, Kevin Maxwell, Esq., through his office staff, received a meeting request for July 27, 2021 from, Amy Freyermuth, an in-house counsel for ATF.  This was not unusual because part of Mr. Maxwell's law practice involves representing clients with issues related to ATF.  Mr. Maxwell was not told the subject of the meeting.

12.     At the July 27, 2021 meeting, RBT, through Mr. Maxwell, received a hand delivered letter from ATF Special Agent in Charge Craig Saier of the agency's Tampa, Florida office.  A true and correct copy of the letter is attached as **Exhibit 1**.  Along with Mr. Saier, Ms. Freyermuth was also present at the meeting.

13.     The letter advised RBT that ATF had conducted an "examination" of the FRT-15 and, based upon that examination, had "classified" the FRT-15 as a "machinegun" for purposes of the NFA and GCA.  The letter ordered RBT to "cease and desist all manufacture and transfer of

the FRT-15" and threatened criminal prosecution for noncompliance.  The letter is henceforth referred to as the "Cease-and-Desist Letter."

14.     The report of ATF's "examination" of the FRT-15 was not provided to RBT with the Cease-and-Desist Letter.

15.     The Cease-and-Desist Letter has been styled by ATF as final agency action which, *inter alia*, purports to deprive RBT of its property right to manufacture and sell the FRT-15. Alternatively, ATF's alleged final agency action could only be the decision to classify the FRT-15 as a "machinegun" or a combination of the Cease-and-Desist Letter and the classification decision.

16.     At the July 27, 2021 meeting, RBT decried the failure of ATF to provide any notice of its investigation or examination of the FRT-15 or of its intent to classify the FRT-15 as a "machinegun," prior to the issuance of the Cease-and-Desist Letter, and objected to ATF's failure to allow RBT to be heard or provide evidence that the FRT is not a "machinegun" under applicable law.

17.     As summarized below, 83 FR 66514 amended the definition of "machinegun" in 27 C.F.R. §§ 478.11 and 479.11, which prior to the amendment through 83 FR 66514, tracked precisely the "machinegun" definition in the NFA and GCA.  Hereinafter these amendments will be referred to as the "Altered Regulations."

18.     The Cease-and-Desist Letter was nominally based upon the Altered Regulations, which were promulgated in the wake of the October 2017 shootings at the Mandalay Bay Hotel in Las Vegas.  The Altered Regulations redefined the term "machinegun" under GCA and the NFA to include, according to its terms, "bump-stock-style devices." The Altered Regulations also created a new criminal offense.

19.     As more fully set forth in paragraphs 55 through 82 below, ATF lacked the authority to redefine the term "machinegun" or create new criminal offenses.

20.     As more fully set forth in paragraphs 84 through 122 below, the FRT-15 is not a "machinegun" under the text of the NFA or the GCA or even under the Altered Regulations.

21.     Well before the July 27, 2021 meeting, RBT had, without any notice of an investigation by ATF, conducted its own due diligence to ensure the FRT-15 could not be classified as a "machinegun" under applicable law.

22.      Before RBT began mass production and sale of the FRT-15 RBT obtained opinions from subject matter experts, each opining the FRT-15 is not a "machinegun" under any applicable law.  Importantly, each of the experts is a retired ATF agent, the majority assigned, in one form or another, to the agency's Firearms Technical Criminal Branch.  Ultimately, four expert reports were obtained by RBT.

23.     During each of the four experts' careers with ATF, they were tasked with giving expert testimony on behalf of ATF in criminal and other proceedings concerning whether firearms and firearm parts met the definition of "machinegun" under the NFA and GCA.

24.     Each of RBT's experts has been qualified many times by federal courts as experts in firearm matters, including in determining whether a firearm or firearm part constitutes a "machinegun."

25.     Before beginning mass production and sale of the FRT-15, RBT also reviewed ATF's previous classifications of other forced reset triggers.  In 2013, ATF examined the Tac-Con 3MR trigger, which is also a forced reset trigger designed for use in semiautomatic firearms.  Attached hereto as **Exhibit 2** is ATF's letter to Tac-Con concluding that the 3MR trigger does not convert a semiautomatic firearm into a "machinegun."

26.     In reliance on the experts' opinions, RBT's own examination of the FRT-15, and ATF's previous classification of forced reset triggers as not being "machineguns," RBT mass produced and sold the FRT-15.

27.     To help educate consumers and to preempt any concerns of ATF, RBT posted on its website animations showing the mechanical operation of the FRT-15 and videotaped interviews with experts that establish the FRT-15 is not a "machinegun."  The animations and videos were on RBT's website for months prior to ATF's issuance of the Cease-and-Desist Letter. The materials are contained in the thumb drive attached as **Exhibit 3** and remain on RBT's website.

28.     At the July 27, 2021 meeting with ATF, Mr. Maxwell, on behalf of RBT, offered to provide its four experts' reports to Agent Saier and pointed to RBT's website's animations as proof the FRT-15 was not a "machinegun," but Agent Saier said the Cease-and-Desist letter would nonetheless stand and directed RBT to comply with terms of the letter.

29.     The Cease-and-Desist Letter provided no hint of any process afforded to RBT to appear in the matter, submit evidence into ATF's administrative record, or otherwise have a meaningful opportunity to be heard.  ATF intentionally refused to provide due process to RBT, knowing its examination report was, among other things summarized in this Complaint, based upon false premises and false statements.

30.     In reliance on ATF's failure to substantiate its "examination" of the FRT-15, RBT's experts, RBT's own analysis of the FRT-15, and ATF's previous classification decisions of similar forced reset triggers, RBT refused to comply with the Cease-and-Desist Letter. RBT's refusal was communicated to ATF in an August 2, 2021 letter, a true and correct copy of which is attached as **Exhibit 4**.

31.     With the August 2, 2021 letter, RBT provided ATF each of its experts' reports and asked that ATF reconsider its classification of the FRT-15 as a "machinegun."  RBT repeatedly requested ATF to consider its experts' opinions and to conduct a reexamination of the FRT-15.  ATF refused these requests.

32.     RBT also asked ATF to make RBT's experts' opinions part of ATF's administrative record with respect to the classification of the FRT-15. The experts' reports are attached as separate exhibits below.  ATF refused this request.

33.     On August 2, 2021, before RBT moved its business to North Dakota, RBT filed a lawsuit against Defendants, among others, in the United States District Court for Middle District of Florida (*Rare Breed Triggers, LLC, et al. v. Garland, et al.*, Case No. 6:21-cv-01245-CEM-GJK) (the "Florida Case").  The Florida Case sought, *inter alia*, temporary injunctive relief.

34.     On August 12, 2021, ATF provided its 66-page examination report to RBT.  **See Exhibit 5.**  ATF's examination report did not address the materials on RBT's website, including without limitation the animations showing the function or mechanical operation of the FRT-15, which are essential to any true and correct technical examination of the FRT-15.  The examination report was signed by David Smith, an ATF Firearms Examination Officer.

35.     As more fully set forth in paragraphs 123 through 142 below, ATF's examination report and the consequent classification of the FRT-15 as a "machinegun" are based, *inter alia*, upon: (i) a predetermined outcome; (ii) an incomplete investigation; (iii) a patently erroneous and unlawful testing methodology; and (iv) materially false statements, statements ATF knew were false at the time they were made.

36.     On August 17, 2021, ATF filed, in the Florida Case, its administrative record pertaining to its classification of the FRT-15 as a "machinegun" and the Cease-and-Desist Letter. The administrative record did not contain the animations or other videos on RBT's website.

37.     The administrative record contained the reports of RBT's four experts, but ATF took the position it would not reexamine the FRT-15 based upon the reports and the court in the Florida Case should not consider the reports. In fact, ATF did not reexamine its classification decision of the FRT-15 considering RBT's four experts' reports.  In short, the inclusion of RBT's experts' reports in the administrative record was meaningless window dressing by ATF, devoid of any material due process meaning or impact for RBT.

38.     On October 6, 2021, a hearing was held in the Florida Case on RBT's temporary injunction motion.  Over objection by the Defendants, including ATF, RBT offered the testimony of Brian Luettke, one of RBT's experts.  Mr. Luettke's career with ATF included training David Smith, who signed the examination report.

39.     Mr. Luettke, who has been qualified by different courts as a firearms examination and classification expert nearly 30 times, further testified that Mr. Smith's examination report was not complete, thorough, or accurate and if Mr. Smith were to swear under oath to the statements made in the examination report, he would be discredited and barred from further testimony ever as an expert under the holding of *Giglio v. United States*.[1]

40.     As more fully set forth in paragraphs 143 through 194 below, ATF has engaged in serial acts to deny RBT pre-deprivation or post-deprivation due process, designed purely to prevent RBT from having the opportunity to rebut the examination report or the Cease-and-Desist Letter.

---

[1]     The Florida Case was dismissed without prejudice on October 28, 2021 due to the parties' failure to comply with the case management procedures under Local Rule 3.02, Middle District of Florida.

41.     ATF's intention is to limit any court review of ATF's actions to its fatally flawed examination report.

42.     In contradiction of the illegitimate Cease-and-Desist Letter, RBT continued manufacture and sale of the FRT-15.  Since then, with full knowledge of ATF, tens of thousands of the FRT-15 have been sold.

43.     Despite its conclusion RBT is selling "machineguns" and despite RBT's refusal to comply with the Cease-and-Desist Letter, ATF has not taken any direct criminal law enforcement action against RBT.  More than ten months have passed since RBT's refusal to comply with the Cease-and-Desist Letter, and still ATF, AG, and DOJ have not initiated prosecution against RBT.

44.     Knowing its classification of the FRT-15 as a "machinegun" cannot withstand scrutiny, ATF has gone to extremes to avoid direct legal confrontation with RBT, to deny RBT any opportunity to present its evidence and experts to any Court, and to deny RBT a full and fair opportunity to be heard, including but not limited to the following:

      a.  Based upon ATF's misclassification of the FRT-15 as a "machinegun," on January 12, 2022, ATF issued a separate letter to RBT's primary manufacturer and supplier of FRT-15 triggers, specifically 3rd Gen Machine, Inc. in Logan, Utah.  A true and correct copy of the January 12, 2022 letter is attached as **Exhibit 6**.  The January 12, 2022 letter, *inter alia*, ordered 3rd Gen Machine, Inc. to "cease and desist from all manufacture and transfer" of FRT-15 triggers and to "immediately surrender all [FRT-15 triggers] currently in [its] possession to ATF."  The January 12, 2022 letter is also nominally based upon Altered Regulations' impermissible redefinition of the unambiguous term "machinegun" in the NFA and GCA.

b.  3rd Gen, Inc., through its counsel, notified ATF of its refusal to comply and intent to continue manufacture of the FRT-15.

c.  On March 26, 2022, armed ATF agents conducted a raid on 3rd Gen Machine, Inc., and served a warrant requiring seizure, *inter alia*, of (i) all FRT-15 triggers; (ii) all materials and components used to "manufacture" and "assemble" FRT-15 triggers; (iii) any computer, computer hard drive, or other physical object relating to RBT; and (iv) all machinery and/or computerized code, blueprints, software and/or programs related to the manufacture of the FRT-15.

d.  ATF seized, *inter alia*, everything related to the above designations, **except for more than a thousand FRT-15s.**  ATF left over 1,000 assembled FRT-15s, each of them a "machinegun" to use ATF's false conclusions, in cardboard boxes in 3rd Gen Inc.'s unsecured parking lot.  ATF did not want to seize RBT's property under the warrant and, thereby, give standing for RBT to have a full and fair challenge to ATF's misclassification of the FRT-15.

e.  The FRT-15s remained unsecured at 3rd Gen Inc.'s parking lot until April 14, 2022, when Lawrence DeMonico, RBT's president, went to 3rd Gen. Inc.'s offices and picked up the cardboard boxes containing the FRT-15s.  Mr. DeMonico began transporting the triggers, which are RBT's property, to another location.

f.  In the early morning hours of April 15, 2022, more than a dozen ATF agents in unmarked vehicles stopped Mr. DeMonico's vehicle.  Mr. DeMonico was ordered out of his vehicle at gunpoint.  With no search or seizure warrant, nor an arrest warrant, ATF seized thousands of assembled FRT-15s and thousands

FRT-15 component parts.  Even though Mr. DeMonico possessed thousands of illegal "machineguns" under ATF's contrived reasoning, Mr. DeMonico was not arrested and was only detained long enough for the ATF agents to seize the FRT-15s in his possession.  In fact, one of the ATF agents literally apologized to Mr. DeMonico, acknowledging the FRT-15 is not a "machinegun."   The FRT-15s and parts seized had a value in excess of $650,000 (based upon the standard retail price of the FRT-15).  Indeed, the value of the seized property is likely much higher because third parties are now selling FRT-15s on one of the nation's most popular firearm or firearm part brokerage websites, <u>with no interference from Defendants</u>, for 4 to 5 times their ordinary retail value.

g.   At the scene, ATF Special Agent Pat Hinnley provided Mr. DeMonico a receipt for the property seized, which is attached as **Exhibit 7**.  Pursuant to 19 U.S.C. 1610, *et seq*., Defendants are required to initiate an action in federal district court for the condemnation of the property.  In such action, RBT is entitled to take discovery, including the deposition of David Smith, the ATF Firearms Examination Officer who signed the examination report, and to offer expert witness targeting ATF's indefensible position that the FRT-15 constitutes a "machinegun." Defendants have intentionally failed to initiate a condemnation proceeding because the last thing they want is Mr. Smith to be cross-examined and for RBT to have a full and fair opportunity to be heard.

h.   ATF's failure to arrest Mr. DeMonico, prosecute RBT's principals, and its failure to initiate a condemnation proceeding are emblematic of its strategy, that is to harass RBT and its suppliers and to avoid any legal action that will enable

11

a Court to hear all the evidence, not just the false narrative in ATF's examination report and in ATF's administrative record.

i. ATF has caused and continues to cause direct harm to RBT.  ATF's property seizure at the premises of 3rd Gen Inc. has significantly impacted RBT's manufacturing capacity and RBT's sales of the FRT-15.  Indeed, ATF's actions have caused RBT's manufacturing capacity and sales to both drop by approximately 85 percent. Further, ATF's actions have caused significant harm to RBT's goodwill and standing in the firearms enthusiast community.

45.    RBT has standing to bring this action.

46.    In Count I, pursuant to Sections 702 and 706 of the APA, RBT seeks an order compelling Defendants to bring a condemnation action relative to the property seized from RBT on April 15, 2022.  In Count II, in the alternative to Count I, RBT seeks a writ of mandamus forcing Defendant to bring a condemnation action. In the remaining counts, RBT seeks a declaratory judgment that the Altered Regulations are void because they are contrary to the U.S. Constitution and directly contrary to Federal Statutes, specifically the NFA and GCA.  RBT seeks an order vacating the Altered Regulations pursuant to Section 706 of the APA.  In sum and substance, the Altered Regulations impermissibly redefined the unambiguous term "machinegun" under the NFA and GCA. Alternatively, the Altered Regulations are void for vagueness under the Due Process Clause of the Fifth Amendment.  Thus, RBT seeks a declaratory judgment that Congress's definition of "machinegun" in the NFA and GCA is the only legally enforceable definition that may be applied to the FRT-15.  RBT seeks a declaratory judgment that the FRT-15 is not a "machinegun" under definition of the NFA or the GCA and order requiring ATF to return all

property of RBT seized from the premises of 3rd Gen Inc. and all property of RBT seized from Lawrence DeMonico on or about April 15, 2022.

47.    Further, RBT brings this action pursuant to Sections 702 and 706 of the APA seeking an order vacating the Cease-and-Desist Letter (Ex. 1) and vacating ATF's classification of the FRT-15 as a "machinegun," which ATF claims is final agency action.  ATF's classification of the FRT-15 as a "machinegun" and its Cease-and-Desist Letter are arbitrary, capricious, an abuse of discretion, a product of due process denied to RBT, a product of bad faith, bias, false declarations by a federal officer, a political agenda, or other improper behavior or biases, incomplete investigation, or otherwise not in accordance with the law.  ATF's administrative record was infected with these same issues.  Further, RBT seeks a declaratory judgment that the FRT-15 is not a "machinegun" under the Altered Regulations and an order requiring ATF to return all property of RBT seized from the premises of 3rd Gen Inc. and all property of RBT seized from Lawrence DeMonico on or about April 15, 2022.

48.    RBT will seek an order allowing discovery into ATF's classification decision and its issuance of the Cease-and-Desist Letter because they are the product of bad faith and/or the need to advance a political agenda and were the product of an incomplete and biased administrative record rife with omissions and misrepresentations.  The illegitimate administrative record was used to support the issuance of the Cease-and-Desist Letter and to serve as a predicate for ATF's ongoing unlawful harassment of RBT.

**General Allegations**

**The Statutes Governing "Machineguns"**

49.    In 1986, Congress amended the GCA (18 U.S.C. § 922(o)(1)) to make it a crime for a private person, with very limited exceptions not relevant here, to possess or transfer a

"machinegun" as defined by the NFA.  The GCA also expanded the definition of "machinegun" found in the NFA of 1934.

50.     In 26 U.S.C. § 5845(b), the NFA currently defines a "machinegun" as follows:

"The term 'machinegun' means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, and any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person."

The underlined language was the product of the 1986 GCA amendment, with the original NFA language in standard font.

51.     Importantly, a "machinegun" is **not** defined under the NFA or GCA by how fast it can fire – but rather by the method in which it can fire fast.

52.     It is within the sole ambit of Congress to pass legislation again expanding the definition of "machinegun." Congress has done that once regarding the definition of "machinegun." This lawsuit is, in large part, about AG's and ATF's usurpation of that role.

53.     The consequences of the definition of "machinegun" are staggering.  Any person possessing or transferring a "machinegun" in violation of these federal statutes may be fined $10,000 per violation and is subject to imprisonment for a period for a term up to 10 years.  28 U.S.C. § 5871.

54.     Because Congress sometimes moves slowly and often not at all, which is a frequent by-product of a representative democracy, ATF decided to make its own law without authority.

**AG's and ATF's Limited Role in Administering the NFA and the GCA Versus Their Unauthorized Power Grab Through the Altered Regulations**

55.     On October 1, 2017, a madman opened fire on a large group of people in Las Vegas, Nevada, killing 58 people and wounding hundreds of others.  Some of the firearms used were reportedly equipped with bump stocks.

56.     After this shooting, ATF acknowledged in statements before Congress that enormous political pressure was brought to bear by some members of the public on the federal government to find a way to outlaw bump stocks.

57.     In the wake of the killings in Las Vegas, several members of Congress proposed bills banning bump stocks **and** significantly expanding the NFA's or GCA's definition of "machinegun," but none advanced.

58.     With no legislation moving in Congress, ATF acknowledged in statements before Congress and during private meetings with members of the Trump administration that ATF was being compelled to find a way to ban bump stocks through whatever means, including the redefining of the term "machinegun" in the NFA and GCA.

59.     ATF has admitted there is no ambiguity in the NFA's definition of "machinegun," meaning that it has no gaps to fill or need of interpretative rulemaking authority.  ATF has further admitted it has no legislative rulemaking authority regarding the "machinegun" definition.

60.     Nonetheless, given the pressure from the White House, on March 29, 2018, ATF issued a "Notice of Proposed Rulemaking," proposing to classify bump stocks as "machineguns" under the NFA and the GCA, and significantly expanding the definition of "machinegun" in the Code of Federal Regulations.

61.     On December 26, 2018, AG and ATF issued 83 FR 66514.

15

62.     83 FR 66514 amended the NFA's and the GCA's definition of "machinegun" by amending three regulations, two of which are relevant here: 27 C.F.R. §§ 478.11, and 479.11. Prior to the amendments, the regulations tracked exactly the definition of "machinegun" in the NFA and GCA.

63.     The amendment to Section 478.11 amends the definition of "machinegun" under the GCA, purportedly under AG's authority under 18 U.S.C. § 926(a).  Final Rule, 83 F.R. at 66514.

64.     The amendment to Section 479.11 amends the definition of "machinegun" under the NFA, purportedly under the authorization of 26 U.S.C. § 7805.  Final Rule, 83 F.R. at 66514.

65.     The definition of "machinegun" under the amended Sections 478.11 and 479.11 are the same:

> a "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.  The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.  <u>For purposes of this definition, the term 'automatically' as it modifies 'shoots, is designed to shoot, or can be readily restored to shoot,' means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger; and</u>

'single function of the trigger' means a single pull of the trigger and analogous motions.  The term 'machinegun' includes a bump-stock-type device, i.e., a device that allows a semi-automatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semi-automatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter.

The underlined font shows the addition to the "machinegun" definition and what amounts to new criminal offenses.

66.     ATF is using its redefinition of "machinegun" in the Altered Regulations to target RBT and the FRT-15, as seen in the Cease-and-Desist Letter, the January 12, 2022 letter to 3rd Gen Machine, Inc., and the subsequent terrorization of 3rd Gen Machine, Inc. and its employees resulting in cessation of RBT's business with 3rd Gen Machine, Inc.

67.     To lawfully promulgate the Altered Regulations, AG and ATF needed an express delegation of power in a statutory law to create a regulatory standard backed by criminal penalties.

68.     Congress did not give AG, or by extension ATF, the power to define, redefine, or otherwise amend the NFA and GCA definition of "machinegun." In the NFA and later in the GCA, Congress exercised its Constitutional authority to specifically define "machinegun", leaving nothing for AG or ATF to do but enforce those laws.

69.     ATF, through AG, has limited authority under the Gun Control Act to promulgate: "only such rules and regulations as are necessary to carry out the provisions of [GCA]." 18 U.S.C. § 926(a).

70.     Under the National Firearms Act, ATF, through AG, has the authority to "prescribe all needful rules and regulations for the enforcement of this title...."  26 U.S.C. § 7805(a).

71.     Congress gave AG and ATF authority to promulgate and enforce rules under the NFA and the GCA, but Sections 926(a) of the GCA and 7805(a) only give AG and ATF the power to enforce the statutes as written – not the power for AG and ATF to make their own law if the statutes are not politically expedient.

72.     AG and ATF know they have very limited authority to make criminal law under the GCA.

73.     For example, the GCA **does give** express authority to AG to create criminal laws in a very narrow space, but **not** in any manner relevant to the definition of "machinegun." Under 18 U.S.C. §§ 922(m), 923, and 924(a)(3)(B), the GCA permits AG to enact rules backed by criminal sanctions.  Section 923 requires licensed firearm distributors to keep such records "as the Attorney General may by regulations prescribe" and Sections 922(m) and 924(a)(3)(B) make it a misdemeanor for licensees to violate the statute's recordkeeping provisions "or the regulations promulgated thereunder."

74.     AG and ATF likewise know that the NFA also gives AG express power to make regulations about licensing and registration requirements, the violation of which is a crime.  26 U.S.C. §§ 5812(a), 5822, 5841(c), 5842-44, 5861.  However, AG and ATF know or should know none of these laws authorized AG or ATF to make changes to the scope of the "machinegun" definition in the NFA.

75.     The Altered Regulations are in excess of AG's and ATF's statutory authority and should be vacated.

**The Altered Regulations Impermissibly Contradict the NFA and GCA**

76.   For the Court's convenience, ATF's definition of "machinegun" promulgated under the Altered Regulations are quoted here, with key elements emphasized for comparison in bold and italics:

> "Machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, **automatically** more than one shot, without manual reloading, by a **single function of the trigger**. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person. For purposes of this definition, **the term 'automatically'** as it modifies 'shoots, is designed to shoot, or can be readily restored to shoot,' **means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger; and 'single function of the trigger' means a single pull of the trigger and analogous motions**. *The term 'machinegun' includes a bump-stock-type device, i.e., a device that allows a semi-automatic firearm to shoot more than one shot with a single pull of the trigger* by harnessing the recoil energy of the semi-automatic firearm to which it is affixed *so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter.*

77.   The definition conflicts with the definition of "machinegun" in the NFA and the GCA, which, by the letter of the law, focused on "automatic" firing of more than one shot being caused by a "**single function of the trigger**." 28 U.S.C. § 5845(b).

78.   The Altered Regulations redefine "single function of the trigger," which were Congress's words in its "machinegun" definition, with "single pull of the trigger." However, in Section 5845 of the NFA, Congress expressly used "single pull of the trigger" to define very distinct other firearms, **specifically "rifles" and "shotguns**." 28 U.S.C. §§ 5845(c)-(d).

79.   The Altered Regulations impermissibly contradict the intent of Congress by conflating the meaning of "single function of the trigger" and "single pull of the trigger."

80.     The definition of "function" of a tangible thing, available at the time of passage of the GCA, meant: the "natural and proper action" that it performs *American Heritage Dictionary of the English Language*, 533 (1969). In choosing this word, Congress was clearly focusing on the mechanism that makes the trigger and the corresponding parts of the gun work automatically.

81.     The Altered Regulations impermissibly negate the distinction that Congress drew between "pull" and "function" of triggers in Section 5845, the entirety of which contains just 1,094 words.

82.     Among the other reasons summarized in this Complaint, the Altered Regulations cannot stand because they are manifestly contradictory to the NFA and the GCA.

**The Altered Regulations are Void for Vagueness**

83.     The Altered Regulations are void for vagueness.  The only clear thing the Altered Regulations did was ban bump stocks, but the FRT-15 is not a stock, let alone a bump stock. However, the Altered Regulations also purport to ban "bump-stock-style devices." In this fashion, the Altered Regulations are impermissibly vague in regard to their definition of "bump-stock-style devices" and are therefore void for the following non-exclusive reasons:

a.  The Altered Regulations are ambiguous in their use of the phrase "so that the trigger resets and continues firing without additional physical manipulation of the trigger." The Altered Regulations criminalize bump stocks and purports to criminalize other undefined "devices" ATF deems of a similar "style, but, paradoxically, bump stocks cannot fire more than one round without the trigger resetting <u>and</u> repeated contact with the shooter's finger.  In essence, bump stocks fire successive shots by ramming the reset trigger into the shooter's <u>stationary</u> finger.  83 FR 66514 admits this point.  However,  the FRT-

Case 3:22-cv-00085-ARS   Document 1   Filed 05/16/22   Page 21 of 61

15 can never fire more than a single shot, until and unless the shooter allows the trigger to reset and pulls the reset trigger subsequent time. A person of ordinary intelligence is left to speculate what "without additional physical manipulation" means. For example, while a shooter's act of keeping his or her finger stationary might operate a bump stock as they are designed (and be consistent with "without additional physical manipulation of the trigger"), stationary finger position will not operate an FRT-15 or other forced reset triggers. In the forced reset trigger context, confusion occurs because the question becomes whether "without additional physical manipulation" relates to the reset function or the subsequent trigger pull or both. A forced reset trigger can be overcome by holding the trigger fully to the rear. For a forced reset trigger to fire more than one shot, the shooter must allow the trigger to reset and then again pull the trigger. Does allowing the trigger to reset mean there is "additional physical manipulation" making the trigger lawful under the Altered Regulations? No forced reset trigger can overcome the shooter. If the shooter holds a forced trigger to the rear, the trigger will not reset, and the firearm will not fire again. A reasonably intelligent person cannot reasonably determine what is prescribed by the Altered Regulations, including whether the FRT-15 and other forced reset triggers fall within its prohibited "devices." Notably, ATF has not, despite all the time that has passed, publicly stated that or which forced reset triggers constitute a "machinegun."

b. The Altered Regulations are ambiguous in their use of the phrase "single pull of the trigger" in its application to semiautomatic firearms. No semiautomatic

firearm requires a shooter to fully release the trigger (or remove their finger from it) to fire another shot.  More specifically, after firing a single shot through a full pull of the trigger against the rear of the trigger well, semiautomatic triggers are able to reset the mechanisms (*i.e.*, trigger, hammer, sear interface [where the trigger is locking the hammer in the ready to fire position]) to fire the firearm again by partially releasing tension on the trigger until the trigger resets (which can be felt by the shooter's finger and heard when tension is partially released). Therefore, no semiautomatic firearm, whethert equipped with a forced reset trigger like the FRT-15 or not, can shoot more than one round with a "single pull of the trigger."  A reasonably intelligent person could conclude that all semiautomatic firearms fall within the Altered Regulations' prohibition because the Altered Regulations' suggest a shooter must remove their finger completely from the trigger before they can then pull the trigger again and fire another shot.

c.  The phrase "single pull of the trigger" is so ambiguous ATF had to attempt to modify it in an attempt to make it apply to RBT and 3rd Gen Machine, Inc.. In its July 26, 2021 letter to RBT (Ex. 1), ATF concluded:

ATF has concluded the Rare Breed Triggers, model FRT-15, is a combination of parts designed and intended for use in converting a weapon into a machinegun, hence, the FRT-15 has been classified as a "machinegun" as defined by the NFA and GCA.  ATF's examination found the Rare Breed Triggers, model FRT-15, allows a firearm to expel more than one shot, without manual reloading, with a single, **continuous** pull of the trigger.  Because the FRT-15 is properly classified as a "machinegun" you must . . .

(Ex. 1.) (Emphasis added.)

In its January 12, 2022 letter to 3rd Gen, Inc. (Ex. 2), ATF used the very same language to express its conclusion the FRT-15 is a "machinegun."

d.  The addition of the word "continuous" in its Cease-and-Desist Letters conflicts with the Altered Regulations' "without additional physical manipulation" language. To a person of reasonable intelligence, "single <u>continuous</u> pull" of the trigger would mean an uninterrupted pull. Forced reset triggers cannot function without an "additional physical manipulation" beyond the "single pull" of the trigger the Altered Regulations express (i.e., the shooter must physically allow the trigger to reset and then pull the reset trigger again to fire another shot).

e.  ATF's alteration of its own rule language, in its efforts to enforce their rule is evidence of the Altered Regulations' ambiguity.  Unfortunately for ATF, the addition of the word "continuous" did more harm than good to ATF's position.  A "single continuous pull" of a trigger of a semiautomatic firearm, even one equipped with a forced reset trigger like the FRT-15, will result in the firing of only a single shot because the trigger will not reset and, therefore, the mechanisms that cause the trigger to again function will not occur.

f.  Most telling in terms of the Altered Regulations' ambiguity, is that other forced reset triggers (*e.g.*, the Tac-Con 3MR trigger), which operate using the very similar mechanical underpinnings as the FRT-15 just with different designs, have not been the subject of cease-and-desist letters from ATF or conclusions by ATF that they are "machineguns." In fact, in an October 31, 2013 letter to Tac-Con, ATF specifically concluded the Tac-Con 3MR is not a "machinegun"

and ATF has never rescinded that decision or reclassified that trigger as a "machinegun." ATF's dissimilar treatment of similar devices underscores the ambiguity of the Altered Regulations.  As of the date of the filing of this Complaint, the 3MR trigger remains for sale on a variety of websites, including the manufacturer's.  Perhaps most glaring is that ATF knows that FRT-15s are being sold on firearm or firearm parts websites, despite their quixotic position that the FRT-15 is a "machinegun." Defendants clearly do not know what the Altered Regulations mean, otherwise there would not be such disparate enforcement efforts and attempts to reword the Altered Regulations to attack the FRT-15.

**The FRT-15 is Not a "Machinegun" under the NFA or the GCA Because it Does Not Fire More Than One Shot with a Single Function of the Trigger**

84.     After firing a single shot, all semiautomatic firearms require the trigger to be mechanically reset before another shot can be fired.  All semiautomatic firearms restrain the hammer from falling, and thus prevents another shot from being fired, until the trigger is again functioned.

85.     The vast majority of machineguns operate with what is commonly referred to as an "auto sear." After a single function of the trigger by the shooter, the auto sear takes over the function of the trigger (and automatically releases the hammer to fire all subsequent shots) until the shooter releases the trigger.  In other words, in a machinegun, the trigger never resets, and the hammer and trigger never interact after the first function of the trigger.

86.     More specifically, the auto sear replaces the need to function the trigger more than once for multiple shots because the auto sear mechanically releases the firearm's hammer to fall as soon as the firearm has chambered a new round, and this will continue from the single function

of the trigger without any reset.  The hammer is not restrained from falling like in a semiautomatic firearm.

87.     The FRT-15 **does not** operate as an auto sear, nor does it operate with an auto sear.

88.     Indeed, as set forth below, the FRT-15 requires a separate and independent reset and function of the trigger for each round fired.

89.     Thus, by definition, the FRT-15 **does not** make a semiautomatic rifle into a "machinegun".  Rather, the only thing the FRT-15 does is enable a shooter to accomplish a faster follow-up shot because of the speed at which the trigger resets and can be functioned again.

90.     The videos showing the FRT-15 functioning just as a semiautomatic trigger are attached as **Composite Exhibit 8** (thumb drive).

91.     A semiautomatic firearm equipped with an FRT-15 functions like any other semi-automatic firearm following an eight-step process in operation: (i) firing by functioning the trigger; (ii) unlocking the bolt; (iii) extracting the spent shell casing; (iv) ejecting the spent shell casing; (v) cocking the hammer; (vi) feeding a new round from the magazine; (vii) chambering the new round in the barrel; and (viii) locking the bolt.  After this process is complete, the shooter may function the trigger again to fire another shot.

92.     With the bolt locked in the chamber, a round of ammunition in the chamber, and the firearm's safety off, the cycle of operation begins when the shooter functions the trigger and fires the round.

93.     As the round passes the gas port, most of the gas from the explosion of the round is vented through the gas tube and that force begins the process of sending the bolt carrier to the rear of the firearm.

94.     When that process starts, the bolt then unlocks and the brass of the spent cartridge is then extracted from the chamber and ejected from the firearm.

95.     Like all AR-15 firearms, as the bolt carrier moves to the rear, it cocks the hammer of the firearm.

96.     In the FRT-15's patented design, as the bolt carrier cocks the hammer, the force of the cocking hammer also forces a reset on the trigger by pushing the trigger forward and making the trigger ready to function again.  The subsequent firing of another round of ammunition cannot occur without the shooter functioning the trigger again.

97.     This is referred to as a "forced reset" and it is this forced reset that makes the FRT-15 legal under the NFA and GCA because it requires a separate and independent function of the trigger by the shooter in order to expel another round of ammunition, i.e., the trigger is forced to mechanically reset itself and must be functioned again before it can fire an additional round.

98.     Simultaneously, as the FRT-15 trigger is forced into its reset position, a locking bar, which is part of the trigger assembly, pivots into position and mechanically locks the trigger forward.  This is what prevents the trigger from functioning again, regardless of the amount of force applied to the trigger, until the cycle of operation is complete.

99.     Continuing through the cycle, the buffer spring behind the bolt carrier pushes the bolt carrier forward which is what feeds a new round of ammunition into the chamber from the magazine. That new round of ammunition is forced into the chamber as the bolt closes and locks into place.

100.     It is only after the bolt begins to lock into place inside the chamber and the locking bar is disengaged that the trigger can function again to fire/expel another round of ammunition upon the subsequent function of the trigger.  Until the trigger is functioned again, the firearm will

not and cannot fire another round. In fact, if sufficient force were placed on the trigger to the rear in an attempt to overcome the forced reset function, the firearm will cease operation.

101.    Because the FRT-15 requires a separate rearward function of the trigger for each discharge of the firearm, it is <u>not</u> a "machinegun".  While the FRT-15 allows for a more rapid subsequent firing of the next round by the firearm, it <u>does not</u> allow more than one round of ammunition to be expelled per single function of the trigger, and therefore it <u>does not</u> meet the definition of a "machinegun" under the above-cited laws.

102.    RBT, however, did not simply come to this determination on their own.

103.    Before the FRT-15 ever went to manufacturing, RBT submitted their prototype to legal counsel, Kevin P. McCann, Esq., seeking a legal opinion letter about the FRT-15's compliance with the federal laws outlined above.

104.    Mr. McCann runs a legal practice and is a former ATF Resident Agent in Charge, retiring from ATF after 25 years.

105.    On or about July 31, 2020, Mr. McCann provided a legal opinion letter on this subject ("McCann Opinion Letter").  A true and correct copy of the McCann Opinion Letter is attached hereto as **Exhibit 9**.

106.    Mr. McCann provided a full analysis of the function of the FRT-15 and analyzed its function against the definition of a "machinegun" under federal law.

107.    Mr. McCann concluded that the FRT-15 <u>does not</u> meet the definition of a "machinegun" under federal law.

108.    RBT further sought a second opinion on the FRT-15 prototype from the International Firearms Specialist Academy ("IFSA") in Dallas, Texas.

109.     IFSA's Director, Daniel O'Kelly, is also a former ATF Senior Special Agent and the Chief Firearms Technology Instructor at ATF National Academy, where he wrote and co-wrote the entire firearms technology course of study used to train ATF Agents and Investigators on, among other things, what is and is not a "machinegun" under federal law.

110.     On or about August 6, 2020, Mr. O'Kelly provided his detailed analysis of the FRT-15's function against the definition of a "machinegun" under federal law, and he also concluded the FRT-15 <u>does not</u> meet the definition of a "machinegun" under federal law. ("IFSA Opinion Letter").  A true and correct copy of the IFSA Opinion Letter is attached hereto as **Exhibit 10**.

111.     After the FRT-15 went into manufacturing, RBT sought two additional examinations and opinions from two additional national firearms experts to ensure that any development changes to aid in the manufacturing of the FRT-15 had not changed its function in any way that would cause it to fall under the definition of a "machinegun".

112.     On or about February 24, 2021, RBT received an opinion letter from Rick Vasquez, another former ATF Special Agent and Former Acting Chief of the Firearms Technology Branch. Mr. Vasquez served as ATF's expert on all Gun Control Act and National Firearms Act identification and classifications for the Firearms Technology Branch of ATF (which is the same branch who allegedly conducted ATF's examination of the FRT-15 under the Cease-and-Desist Letter to RBT).

113.     Mr. Vasquez also analyzed the functions of the FRT-15 against the definition of a "machinegun" under federal law and concluded the manufactured version of the FRT-15 <u>does not</u> meet the definition of a "machinegun" ("Vasquez Opinion Letter).  A true and correct copy of the Vasquez Opinion Letter is attached hereto as **Exhibit 11**.

114.    On or about May 4, 2021, RBT received another opinion letter from Firearms Training and Interstate Nexus Consulting, LLC ("FTINC") in Grand Rapids, Michigan, via the company's owner, Brian Luettke.

115.    Mr. Luettke is another former ATF Special Agent with 22 years' experience, and an instructor at ATF's National Academy where he taught the application of the GCA and the NFA relating to identifications and classifications.  Further, in his last position with ATF, Mr. Luettke was the Chief of Advanced Firearms and Interstate Nexus Branch, a sub-branch of the Firearms and Ammunition Technology Branch.

116.    Mr. Luettke provided RBT with yet another opinion letter confirming the manufactured version of the FRT-15 does not operate as a "machinegun" as defined under 26 U.S.C. § 5845(b). ("FRINC Opinion Letter).  A true and correct copy of the FRINC Opinion Letter is attached hereto as **Exhibit 12**.

117.    These four experts, with over 100 years of combined law enforcement experience, are well known to the Defendants.  This is not only because of their former employment as ATF special agents, but also because the DOJ and ATF has presented each of them as experts in their own cases and criminal prosecutions on the subject of what does and does not constitute a "machinegun" under federal law.

118.    In reliance upon the opinions of RBT's legal counsel and the opinions of these qualified subject matter experts and former ATF agents, RBT continued to manufacture and  sell the FRT-15.

**The FRT-15 is Not a "Machinegun" under the Altered Regulations, Assuming *Arguendo* the Altered Regulations are Valid**

119.    The Altered Regulations purport to redefine "single function of the trigger" as "single pull of the trigger and analogous motions."

120.    Even under that invalid and terrifically ambiguous definition, the FRT-15 does not operate as a "machinegun."

121.    If a shooter pulls the FRT-15 trigger and holds it against the rear of the trigger well, the FRT-15 will not function again.  It will not fire another shot and the firearm will malfunction. The FRT-15 will not do what it is designed to do, that is force the reset of the trigger to provide a faster follow up function of the trigger.

122.    The Cease-and-Desist Letter's attempt to redefine "single pull" to "single continuous pull" does nothing to improve ATF's objective of classifying the FRT-15 as a "machinegun." In fact, quite the opposite. "Continuous" can only be defined as uninterrupted.  A single, uninterrupted pull of the FRT-15 as described above will cause the exact result, that is, only a single shot fired and a firearm malfunction.

**ATF's Examination of the FRT-15 was Invalid, and the Outcome was Predetermined**

123.    In or around January 2021, ATF opened an investigation into RBT and into the FRT-15 trigger based upon online videos it viewed of persons supposedly using the FRT-15 trigger.  RBT was never notified of this investigation before the Cease-and-Desist Letter to RBT was issued by ATF.

124.    ATF's own records show that after opening this investigation, ATF agents began sending e-mails between one another stating that the FRT-15 was expected to be classified as a "machinegun," but that this could not officially be done until ATF obtained an FRT-15 trigger and conducted a formal test.  The emails and web postings referenced by the ATF are attached as **Exhibit 13**, and reference ATF's consideration of a pornographic website, (wholly unaffiliated with RBT) in its investigation.

125.    In or about June 2021, ATF claims they finally obtained an FRT-15 trigger and began conducting "tests" upon the alleged FRT-15 trigger they had obtained.  The test was conducted by David Smith, an ATF Firearms Enforcement Officer, whose job nominally requires the fair and objective testing of firearms and firearm parts to determine whether they meet the definition of "machinegun" under federal law.

126.    As will be explained below, the test conducted by Mr. Smith was based upon unreliable, illegal, and non-technical testing methods and was intentionally misleading, with the purpose being to ensure the test met with the predetermined outcome being sought by ATF, *i.e.*, to classify the FRT-15 as a "machinegun" consistent with the purpose and political pressures behind the Altered Regulations.

127.    Mr. Smith attempted to prove the FRT-15 was a "machinegun" by allegedly installing an FRT-15 in a semiautomatic rifle and zip-tying the trigger.  While Mr. Smith's examination report makes no mention of this zip-tie test and gives no explanation or analysis of it, ATF relies upon a video of it as evidence the FRT-15 is a "machinegun".

128.    The video looks like a homemade recording done by children. It was made with a cell phone, from a very poor angle and from too far away to see the trigger function. The video depicts Mr. Smith depressing the supposed FRT-15 trigger and holding it to the rear while adding a zip-tie, allegedly to hold it in place.

129.    Mr. Smith then placed a magazine into the receiver and pulled back the bolt to chamber the first round.

130.    The video then depicts the weapon repeatedly firing rounds until the magazine is empty.

131.    The first reason that this test is misleading is that ATF's administrative record fails to contain any evidence showing the trigger used in this video is, in fact, an FRT-15 trigger.  As previously stated, there is no mention of this test made in Mr. Smith's report, and ATF failed to place the weapon used, or any logs showing the modifications to this firearm, into the administrative record of the case.  Thus, there is nothing to prove that Mr. Smith's "test" was actually conducted using an FRT-15 trigger.

132.    Secondly, even if an FRT-15 trigger was used, Mr. Smith's "test" is invalid and misleading.

133.    Under 26 U.S.C. § 5845(b), when Mr. Smith installed the zip-tie he added a part that otherwise does not exist on the FRT-15.  Thus, the FRT-15 could not be legally classified as a "machinegun" based on this test because Mr. Smith only created a "machinegun" by adding an extra part.

134.    The invalidity of the zip-tie test undermines ATF's classification of the FRT-15 as a "machinegun."

135.    On June 25, 2007, Richard Vasquez, then Acting Chief of ATF's Firearms Technical Branch, authored a position paper that adding a shoestring, in a particular manner, to a semiautomatic rifle constituted the creation of a machinegun.  A copy of the letter is attached as **Exhibit 14**.  Therefore, Mr. Smith's addition of the "zip-tie," just as the addition of the shoestring, constitutes a violation of the GCA and NFA.

136.    Mr. Smith's "test" is also invalid and misleading because the zip-tie acts as a spring that repeatedly causes the functioning of the trigger.  The addition of the zip-tie is meant to give the appearance the trigger is stationary and does not move.  But the reality is the zip-tie may have enough play in it that when the trigger forcibly resets and pushes against the zip-tie, the springiness

of the zip-tie may cause the trigger to depress again.  Thus, the trigger is actually functioning multiple times even though the zip-tie "test" is creating the illusion that it is a single function.

137.    In addition to this invalid, misleading and undocumented zip-tie "test", ATF's own records show they attempted to classify the FRT-15 as a "machinegun" by reliance on a patent **for a different trigger** and by comparing it to other triggers the agency had previously ruled were machineguns even though those other triggers do not function anything like the FRT-15.

138.    ATF then intentionally failed to compare the FRT-15 to other triggers (namely the Tac-Con 3MR trigger) that function similar to the FRT-15 and which ATF had previously found were *not* machineguns.  Indeed, the 3MR trigger remains in production and for sale without a word of protest from ATF.

139.    ATF report, drafted by Mr. Smith, even went so far as to claim that the FRT-15 patent (10,514,223 B1) is the **same** as patents for these other dissimilar triggers (Patents 10,254,067 B2 and 9,568,264), even though the FRT-15 has a separate and distinct patent.

140.    Thus, to accept the explanation by ATF (*i.e.*, that the FRT-15's patent is the **same** as these other patents), the Court would have to implicitly conclude that United States Patent Office acted incompetently by approving and issuing a patent for the FRT-15 design even though an identical patent had already been issued to someone else – an assertion which is demonstrably false.

141.    The examination report also arbitrarily relied upon unverified and uninvestigated video postings and comments of persons posting in internet chatrooms (whose names and credentials are unknown) as a basis for determining the FRT-15 to be a "machinegun" before ATF had ever even examined the FRT-15.

142.     ATF's examination report and the Cease-and-Desist Letter upon which it is based are worthy of no deference by this Court and, if they warrant anything, it is the scorn of this Court.

**ATF's Serial Denial of Due Process to RBT**

143.     Egregiously, ATF did not, either before or after ATF issued its alleged final agency action (i.e., the classification decision and/or the Cease-and-Desist Letter), contact RBT to conduct an interview or to offer RBT any opportunity to rebut the claims of ATF or to place any materials into the administrative record.

144.     As will be detailed below, RBT never even knew any investigation was underway until **after** ATF had already delivered the Cease-and-Desist Letter to RBT and closed its administrative record.

145.     ATF took its alleged final agency action by classifying the FRT-15 as a "machinegun" and/or signing the Cease-and-Desist letter on July 26, 2021, thus (according to ATF) closing the administrative record.

146.     That same day (July 26, 2021), ATF called RBT, through Kevin Maxwell, and asked him to come in for a meeting with ATF the following day.  It is important for the Court to note RBT was not advised as to the substance of the meeting during the phone call on July 26 and thus still had no idea any investigation was or had occurred.

147.     When the meeting took place the following day, July 27, 2021, Agent Craig Saier informed RBT he had been directed by his chain of command at ATF to issue RBT the Cease-and-Desist Letter because ATF had "examined" the FRT-15 and had determined it to be a "machinegun" under the definitions of 26 U.S.C. § 5845(b).

148.     According to ATF's records, the examination and report referred to by Agent Saier were already completed well before the July 27, 2021 meeting.  Nonetheless, no copy of the report was provided to RBT at that meeting.

149.     Instead, when RBT asked to see the alleged examination report at the meeting, Agent Saier admitted to RBT he did not have a copy of the examination report and had never seen it.

150.     During this same July 27, 2021 meeting, Agent Saier advised he would look into getting a copy of the report to RBT, but no copy of the report was ever provided by Agent Saier.

151.     Without any knowledge of what was contained in this alleged examination report by ATF, RBT advised Agent Saier at the meeting that RBT was familiar with some of the improper tactics ATF commonly employs during "testing" and they already suspected ATF had attached a zip-tie to the FRT-15 in an effort to wrongfully classify it as a "machinegun".

152.     RBT further advised Agent Saier they disagreed with any conclusion which suggests the FRT-15 can shoot more than one round by a single function of the trigger.

153.     RBT informed Agent Saier this was not just RBT's opinion because before the first FRT-15 was manufactured, the design was reviewed in detail by Retired Special Agent Kevin McCann, Esq., and former ATF Senior Special Agent, Program Manager and Chief Firearms Technology Instructor Daniel G. O'Kelly, and later by Rick Vasquez and Brian Luettke, specifically for the FRT-15's compliance with both the NFA and the GCA, and that all of these experts had rendered the opinion that the FRT-15 is not a machinegun.

154.     RBT finally advised Agent Saier they were deeply concerned about ATF's conclusion because ATF's Firearms Technology Branch has previously approved a forced reset trigger similar to the FRT-15, called the 3MR trigger, in October 2013, and to the best of RBT's

knowledge and belief, the 3MR trigger design remains approved and available for purchase on the open market.  A true and correct copy of the October 31, 2013 approval letter for the 3MR trigger is attached hereto as **Exhibit 2**.

155.    Agent Saier then hand delivered the Cease-and-Desist Letter to RBT.  This was the first time (on July 27, 2021) that RBT had been given a copy of the Cease-and-Desist Letter.

156.    Over the next week, despite the fact ATF had supposedly finished the examination report well before its meeting with RBT and despite repeated demands to ATF by RBT to be given a copy of the examination report, no copy was provided to RBT.

157.    Since no copy of the examination report was forthcoming, on August 2, 2021, Mr. Maxwell sent a letter to Agent Saier and ATF's counsel outlining that he had still not been provided with a copy of ATF's examination report, and that he was providing copies of each of his original experts' reports mentioned at the previous meeting demonstrating that the FRT-15 had been thoroughly examined and determined not to be a "machinegun".  It is important for the Court to note these were RBT'S <u>original</u> expert reports.  These expert reports <u>were not rebuttals</u> to ATF's examination report **<u>because at this time, ATF had still not provided their examination report</u>** to the Plaintiff even though the agency had supposedly completed the report weeks before, and despite the fact that RBT had repeatedly requested it since July 27, 2021.

158.    Mr. Maxwell's letter further requested reconsideration by ATF based upon: (1) his original expert reports; and (2) the lack of any proof of any examination by ATF demonstrating how the agency concluded the FRT-15 was a "machinegun".  Mr. Maxwell's letter is attached hereto as **Exhibit 4**.

159.    But even though Agent Saier acknowledged the receipt of Mr. Maxwell's letter, no further response was forthcoming from the agency, and no copy of ATF's examination report was provided by Agent Saier.

160.    ATF's failure to provide the examination report prevented RBT from having the opportunity to have its four experts prepare rebuttal reports.  In other words, ATF was able to have Mr. Smith, as its purported expert, malign the FRT-15 as a "machinegun" with no opportunity for RBT to present anything challenging or contradicting that conclusion.

161.    So, it is important for the Court to note that at this point in early August 2021: Neither before nor after the issuance of the Cease and Desist Letter was RBT ever given any notice of the critical information concerning: (i) how RBT could appear in ATF's administrative hearing; (ii) how RBT could submit evidence to be included in ATF's administrative record; (iii) what time frame such submissions had to occur in; or (iv) what evidence ATF was relying upon to contend that the FRT-15 was a "machinegun".  **These facts are critical to the due process issues in this case because of ATF's subsequent admissions detailed below.**

162.    When ATF failed to respond to Mr. Maxwell's letter, RBT proceeded to file the Florida Case.

163.    The Court in the Florida Case set a preliminary injunction hearing for August 13, 2021.

164.    Shortly before that hearing, on August 11, 2021, Mr. Maxwell e-mailed the Defendants' counsel in the Florida Case to discuss the exchange of witness and exhibit lists for the upcoming evidentiary hearing.  The August 11, 2021 email chain is attached as **Exhibit 15**.

165.    Mr. Maxwell's e-mail further advised he was prepared to have his four experts appear at the hearing to provide their testimony – the only thing RBT could do since ATF had

never given them an opportunity to submit evidence or testimony for inclusion in the administrative record, and because ATF had still never provided RBT with ATF's alleged examination report or with any opportunity to rebut it. **Ex. 15.**

166.    But that same day (August 11, 2021), the Defendants' attorney responded via email to Mr. Maxwell and advised that the Defendants intended to file a Motion in Limine to completely exclude any testimony of RBT's experts, as well as to exclude RBT's original expert reports. **Ex. 15.**

167.    The Defendants' counsel stated (in no uncertain terms) he would seek to exclude **any** evidence by RBT because their evidence was not part of ATF's administrative record. **Ex. 15.**

168.    After the Defendants refused to provide their examination report to RBT, and after the Defendants gave RBT no notice of its administrative proceedings or any opportunity for RBT to submit any evidence or testimony for inclusion in the administrative record, the Defendants proceeded to slam the door to any and all submissions by RBT claiming that the administrative record was closed **as of the date the Cease and Desist Letter was issued (July 26, 2021) – one day before RBT ever knew that an investigation existed (July 27, 2021).** **Ex. 15.**

169.    The evidence of the Defendants' intent to violate the due process rights of RBT can further be seen in the Defendants' expressed intent to exclude RBT's original expert reports from the administrative record as well, even though the Defendants had already received them. **Ex. 15.**

170.    The Court should also note these statements by the Defendants' counsel in **Exhibit 15** are a clear indication that ATF never even reviewed RBT'S original expert reports prior to this e-mail being sent on August 11, 2021. This is because, if the reports submitted by RBT had been reviewed, then ATF would have already included them in the administrative record.   So, RBT

was not only deprived of any meaningful notice, but even to the extent that they had submitted **any** documents, they were completely deprived of a meaningful opportunity to be heard because their submissions were not even considered.

171.    This prompted Mr. Maxwell to reply to the Defendants' counsel and ask exactly when the Defendants had even provided RBT with basic due process.  **Ex. 15.**

172.    Further, as Mr. Maxwell stated in his reply: "ATF's failure or refusal to include my submissions in the administrative record of this case is proof that ATF has never even considered my submissions.  That is the very epidemy of having no meaningful opportunity to be heard.  It is also clear evidence of bad faith on the part of ATF."  **Ex. 15.**

173.    Suddenly realizing they had made a major mistake, the Defendants reversed course and after 5:00 pm on August 11, 2021, they contacted Mr. Maxwell by phone to acknowledge they did in fact receive Mr. Maxwell's letter and the original expert reports he provided.  **Ex. 15.**

174.    Nevertheless, in their filings in the Florida Case, the Defendants were careful to note they found Mr. Maxwell's submissions unimportant because they were not submitted until after the agency's final decision had been made on July 26, 2021.  The Defendants gave no consideration to the fact they never notified RBT of ATF's administrative proceedings until after that date.

175.    Moreover, even though ATF's examination report on the FRT-15 had supposedly existed since June 2021, the Defendants failed to ever provide it to RBT until approximately 2:00 pm on August 12, 2021 – **17 days _after_ the Cease-and-Desist Letter was issued; 10 days _after_ the lawsuit was filed; and 2 hours _after_ the Defendants had already filed their Motion in Limine.**

176.    Thus, August 12, 2021, was the first time that RBT had **ever** been allowed to review ATF's examination report, and upon noting all of the faulty and intentionally misleading tests and evidence relied on by ATF (as outlined above), Mr. Maxwell contacted the Defendants' counsel the following day and advised that his experts were preparing rebuttals to ATF's examination report. The August 13, 2021 email chain is attached as **Exhibit 16**.

177.    Further, as Mr. Maxwell told the Defendants' counsel, because RBT had never before been given the opportunity to review ATF's examination report and respond to it, RBT was requesting that their rebuttal reports be included in the administrative record of this case.  **Ex. 16.**

178.    The Defendants counsel refused to allow any response by RBT to be included in the administrative record, and his justification for this was the administrative record was already closed as of July 26, 2021.  **Ex. 16.**  The Defendants' counsel maintained that position even though ATF's own report was not made available to RBT until more than two weeks after the administrative record closed.

179.    As a result, once again, the Defendants violated RBT due process rights by failing to give RBT any meaningful notice of, or opportunity to respond to, ATF's examination report.

180.    Upon information and belief, the decision to close the administrative record and refuse to allow any rebuttal by RBT was made by Earl Griffith.  This is because, on August 17, 2021, the Defendants submitted their certified "administrative record" to the Court in the Florida Case with a certification signed by Mr. Griffith attesting that this was the complete administrative record.

181.    **The Court should note:**  Mr. Griffith certified that submission in the Florida Case as the official administrative record even though Mr. Griffith knew, or clearly should have known, at that time: (1)  RBT was never given any notice or any opportunity to submit any evidence or

testimony to ATF prior to the agency making its final decision on July 26, 2021; (2)  the "tests" conducted by Mr. Smith were intentionally faulty and misleading; (3)  ATF had failed to consider the original expert reports  submitted by RBT demonstrating why the FRT-15 is not a "machinegun"; and (4)  ATF's examination report was never disclosed to RBT until **after** Mr. Griffith had made the decision to close the administrative record, meaning that RBT would have no opportunity to respond.

182.   These actions were intentionally taken by ATF to deprive RBT of any meaningful notice or opportunity to respond.

183.   During the pendency of the Florida Case, RBT sent their expert rebuttal reports (attached hereto as **Composite Exhibit 17**) to ATF for examination and inclusion in the record, but ATF refused.

184.   ATF further refused to allow the Court in the Florida Case to hear or consider RBT'S expert rebuttal reports under the guise they were not part of the administrative record.

185.   It is also critical for this Court to note that the Defendants' attorney told the Court in the Florida Case - on the record - the reason ATF would not allow these submissions into the administrative record was because the Florida Case was pending and it was RBT who had cut off any ability to make submissions to the administrative record by filing the lawsuit.

186.   This was a deliberate misrepresentation of fact because the Defendants and their counsel had previously refused any submissions by RBT claiming that ATF had already closed the administrative record on July 26, 2021 – over a week before the Florida Case was filed on August 2, 2021.  Thus, the administrative record was already closed before the Florida Case ever existed.

187.   During the pendency of the Florida Case, the Defendants also took the legal position that ATF had the ability to change its interpretation of the term "single function of the

trigger" from one of a mechanical functioning of the trigger to one of a human functioning of the trigger finger, even though the NFA and the GCA are federal criminal statutes.

188.    Further, subsequent to the dismissal of the Florida Case, and due to the representations the Defendants' counsel made to the Court on record as outlined above (i.e., submissions 8by RBT were not allowed because the Florida Case was pending), Mr. Maxwell sent a letter to ATF asking for it to reconsider its position and to add RBT's expert rebuttal reports to the administrative record since the Florida Case was no longer pending.  A copy of the November 2, 2021 letter with the attached submissions are attached hereto as **Composite Exhibit 18**.

189.    On November 15, 2021 ATF acknowledged receipt of these materials and stated those materials had been forwarded to ATF Firearms Technical Branch Division, but never provided RBT with any notice of whether ATF would reconsider its position, or any explanation of why ATF would not change its position based upon the materials submitted by RBT.  ATF's response is attached hereto as **Exhibit 19.**

190.    Having not received a reply from ATF, on December 21, 2021, RBT sent a follow-up letter to ATF, but to date, there has been no response. See **Exhibit 20.**

191.    Despite its failure to respond, ATF has begun enforcement actions on its Cease-and-Desist Letters against RBT's manufacturers and dealers, including without limitation, the January 12, 2022 cease-and-desist letter to 3rd Gen, Inc..  **Ex. 6.**

192.    Further, on or about January 13, 2022, Brendan Iber, in his capacity as Special Agent in Charge of the Phoenix Field Division, Bureau of Alcohol, Tobacco, Firearms, and Explosives acting on behalf of ATF, appeared at the offices of counsel for Prepper's Discount, one of RBT dealers for the FRT-15 trigger and left another Cease-and-Desist Letter advising Prepper's Discount a criminal investigation into RBT is being conducted and demanding the surrender of all

FRT-15 triggers to ATF.   This has resulted in discontinuation of sales of the FRT-15 causing damages to RBT.   A copy of this Cease-and-Desist Letter is attached hereto as **Exhibit 21**.

193.    The fact that these letters confirm a criminal investigation into RBT is occurring is in direct contradiction to the representations of the Defendants' counsel made to the Court in the Florida Case at a hearing on September 16, 2021, shortly before the dismissal.  Attached as **Exhibit 22** is a transcript of that hearing, p. 3, lines 14-16.

194.    The Court should further note these two letters (**Ex. 6 and Ex. 21**) fail to notify the recipients of the reason for the seizure of the FRT-15 triggers.  Instead, the letters state "You will be notified shortly of the basis for the seizure….", which clearly suggests that ATF has not yet decided what legal basis it has for seizing the FRT-15 triggers.

**COUNT I**
**VIOLATION OF SECTION 706 OF THE APA –**
**COMPEL AGENCY ACTION <u>AS TO DOJ</u>**
**ALTERNATIVE TO COUNT II**

195.    RBT realleges each allegation in paragraphs 1 through 194 above as if fully set forth herein.

196.    Pursuant to 5 U.S.C. § 702, any person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

197.    Pursuant to 5 U.S.C. § 704, final agency action is reviewable by the District Court.

198.    Pursuant to 5 U.S.C. § 706, this Court may "compel agency action unlawfully withheld or unreasonably delayed."

199.    DOJ have unlawfully withheld and/or unreasonably delayed the commencement of a condemnation action under 19 U.S.C. § 1610.

200.    The denial or delay of the condemnation action has damaged RBT because, for so long as the condemnation action is denied or delayed, RBT will be denied its statutory right to such condemnation hearing and a full and fair opportunity to cross-examine ATF's witnesses, offer its own expert testimony, and have a full and fair review of the ATF's classification decision and the Cease-and-Desist Letter, both of which wrongly categorize the FRT-15 as a "machinegun."

WHEREFORE, pursuant to 5 U.S.C. §§ 706(1), RBT respectfully requests that the Court grant all appropriate relief, including:

a.    An order compelling DOJ to commence a condemnation action related to the RBT property seized from Mr. DeMonico and from 3rd Gen, Inc.;

b.    An award of attorneys' fees and costs to Plaintiffs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A), and any applicable statute or authority; and

c.    Any other relief that this Court in its discretion deems just and proper.

### COUNT II
### WRIT OF MANDAMUS AS TO DOJ
### ALTERNATIVE TO COUNT I

201.    RBT realleges each allegation in paragraphs 1 through 194 above as if fully set forth herein.

202.    Pursuant to 28 U.S.C. § 1361, the district court has original jurisdiction over any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to RBT.

203.    Under 19 U.S.C. § 1610, RBT has a clear legal right to a condemnation action initiated by DOJ relating to the seizure and claimed forfeiture of the RBT property taken from Mr. DeMonico and the RBT property taken from 3rd Gen, Inc.

204.     DOJ has a clear legal duty to commence and maintain such condemnation action.

205.     RBT has no other available remedy to compel DOJ to comply with 19 U.S.C. § 1610.

WHEREFORE, pursuant to 28 U.S.C. § 1361, RBT respectfully requests this Court to issue a writ of mandamus directing DOJ to perform the statutorily-mandated function of commencing a condemnation action related to the RBT property seized from Mr. DeMonico and seized from 3rd Gen, Inc.

**COUNT III**
**VIOLATION OF SECTION 706 OF THE APA – AGENCY ACTION IN EXCESS OF STATUTORY AUTHORITY**

206.     RBT realleges each allegation in paragraphs 1 through 194 above as if fully set forth herein.

207.     Pursuant to 5 U.S.C. § 702, any person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

208.     Pursuant to 5 U.S.C. § 704, final agency action is reviewable by the District Court.

209.     Pursuant to 5 U.S.C. § 706: "To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706(2)(A).

210.     Further, Section 706 requires courts to "hold unlawful and set aside" agency action that is "not in accordance with law" or in "excess of statutory jurisdiction, authority, or limitations, or short of a statutory right." 5 U.S.C. § 706(2)(C).

211.    The Altered Regulations are invalid because they were promulgated without statutory authority under the NFA or the GCA.

212.    Neither the AG, nor ATF with or without delegation by AG, are empowered by the NFA, the GCA, or any other Federal Statute to promulgate any rule expanding and/or otherwise amend the definition of "machinegun" in the NFA or GCA.

213.    Neither the AG, nor ATF with or without delegation by AG, are empowered by the NFA, the GCA, or any other Federal Statute to promulgate any rule which creates new criminal offenses, which is the purpose of the Altered Regulations.

214.    The Altered Regulations are contrary to AG and ATF's rulemaking authority under 18 U.S.C. § 926(a) and 26 U.S.C. § 7805(a), which only provide AG and ATF with the ability to make rules necessary for the enforcement of the provisions of the NFA and GCA, not the power to amend the NFA or GCA or the power to create new criminal offenses.

215.    Expanding and/or amending the definition of "machinegun" under the NFA and/or GCA is the sole province of Congress, which Congress did through the GCA in 1986.  If the "machinegun" definition is to be amended or expanded, it must be done by Congress – not through the AG or ATF.

216.    The Altered Regulations are therefore not in accordance with law or exceed statutory authority.

217.    The illegitimate Altered Regulations are the claimed legal basis for ATF's (mis)classification of the FRT-15 as a "machinegun" and the issuance of the Cease-and-Desist Letter, both of which ATF claims are final agency actions.

218.    RBT has suffered legal wrongs and have been adversely affected by the actions taken by Defendants' reliance on and enforcement of the Altered Regulations.

219.   RBT will be irreparably harmed by the continued enforcement of the Altered Regulations, ATF's misclassification of FRT-15, its issuance of the Cease-and-Desist Letters, the harassment and terrorization of RBT's manufacturers, dealers, and customers and its seizure of RBT's property.

220.   The FRT-15 is not a "machinegun" under the NFA or GCA.

WHEREFORE, pursuant to 5 U.S.C. §§ 706(2)(A) and (C), RBT respectfully requests that the Court grant all appropriate relief, including:

a.   An order vacating the Altered Regulations;

b.   An order vacating the Cease-and-Desist Letter to RBT, and vacating ATF's classification of the FRT-15 as a "machinegun" and the corresponding administrative record;

c.   A declaratory judgment, pursuant to the Declaratory Judgment Act (28 U.S.C. § 2201-02) or other applicable law, finding that ATF's classification of the FRT-15 as a "machinegun" is unlawful and unenforceable, that the FRT-15 does not constitute a "machinegun" under the NFA or the GCA, that Defendants lack the authority to expand or otherwise amend the definition of "machinegun" under the NFA and/or the GCA;

d.   An award of attorneys' fees and costs to Plaintiffs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A), and any applicable statute or authority; and

e.   Any other relief that this Court in its discretion deems just and proper.

**COUNT IV**
**VIOLATION OF SECTION 706 OF THE APA – AGENCY ACTION IN CONTRADICTION OF STATUTE**

221.    RBT realleges each allegation in paragraphs 1 through 194 above as if fully set forth herein.

222.    Pursuant to 5 U.S.C. § 702, any person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

223.    Pursuant to 5 U.S.C. § 704, final agency action is reviewable by the District Court.

224.    Pursuant to 5 U.S.C. § 706: "To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action."

225.    Further, the APA provides "[t]he reviewing court shall - . . . 2) hold unlawful and set aside agency action, findings, and conclusions found to be: (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ."  5 U.S.C. § 706(2)(A).

226.    The APA requires courts to "hold unlawful and set aside" agency action that is "not in accordance with law" or in "excess of statutory jurisdiction, authority, or limitations, or short of a statutory right." 5 U.S.C. § 706(2)(C).

227.    The Altered Regulations are invalid because the definition of "machinegun" in the NFA and GCA is unambiguous, meaning Congress left no gap for AG or ATF to fill through any rulemaking.

228.    In NFA and GCA's definition, Congress spoke to the precise question at issue (what is a "machinegun"?) and the intent of Congress is clear.  AG and ATF have an obligation to respect and enforce the plain definition of "machinegun" in the NFA and GCA, which they did for decades in countless prosecutions **opposing** contentions the definition is ambiguous.

48

229.    ATF has no authority to substitute the statute's definition with its preferred version in the Altered Regulations, much less the politically driven one that AG and the President directed them to promulgate to assuage the grief and outrage stemming from the Las Vegas tragedy.

230.    Further, the Altered Regulations are invalid because they contradict the unambiguous definition of "machinegun" in the NFA and GCA.  Congress' use of the phrase "single function of the trigger" has a precise meaning, and if not precise, a meaning easily found by resorting to ordinary rules of statutory construction.

231.    AG and ATF may not change, *inter alia*, "single function of the trigger" to "single pull of the trigger . . ." as Congress gave the latter phrasing a precise meaning in the definitions of other firearms, specifically "rifles" and "shotguns." Congress's use of different phrasing in the definitions of these respective firearms manifests its clear intent for "single function" and "single pull" to have different meanings, and AG's and ATF's Altered Regulations impermissibly contradict such intent.

232.    The Altered Regulations are therefore not in accordance with law or exceed statutory authority.

233.    The illegitimate Altered Regulations are the claimed legal basis for ATF's (mis)classification of the FRT-15 as a "machinegun" and the issuance of the Cease-and-Desist Letter, both of which ATF claims are final agency actions.

234.    RBT has suffered legal wrongs and have been adversely affected by the actions taken by Defendants' reliance on and enforcement of the Altered Regulations.

235.    RBT will be irreparably harmed by the continued enforcement of the Altered Regulations, ATF's misclassification of FRT-15, its issuance of the Cease-and-Desist Letters, the

harassment and terrorization of RBT's manufacturers, dealers, and customers and its seizure of RBT's property.

236.    The FRT-15 is not a "machinegun" under the NFA or GCA.

WHEREFORE, pursuant to 5 U.S.C. §§ 706(2)(A) and (C), RBT respectfully requests that the Court grant all appropriate relief, including:

      a.    An order vacating the Altered Regulations;

      b.    An order vacating the Cease-and-Desist Letter to RBT, and vacating ATF's classification of the FRT-15 as a "machinegun" and the corresponding administrative record;

      c.    A declaratory judgment, pursuant to the Declaratory Judgment Act (28 U.S.C. § 2201-02) or other applicable law, finding that ATF's classification of the FRT-15 as a "machinegun" is unlawful and unenforceable, that the FRT-15 does not constitute a "machinegun" under the NFA or the GCA, that Defendants lack the authority to expand or otherwise amend the definition of "machinegun" under the NFA and/or the GCA;

      d.    An award of attorneys' fees and costs to Plaintiffs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A), and any applicable statute or authority; and

      e.    Any other relief that this Court in its discretion deems just and proper.

**COUNT V**
**VIOLATION OF SECTION 706 OF THE APA –CONTRARY TO CONSTITUTIONAL RIGHT - THE FIFTH AMENDMENT'S DUE PROCESS CLAUSE – VOID FOR VAGUENSS**

237.    RBT realleges each allegation in paragraphs 1 through 194 above as if fully set forth herein.

238.    Pursuant to 5 U.S.C. § 702, any person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

239.    Pursuant to 5 U.S.C. § 704, final agency action is reviewable by the District Court.

240.    Pursuant to 5 U.S.C. § 706: "To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706(2)(A).

241.    Further, "[t]he reviewing court shall - . . . (2) hold unlawful and set aside agency action, findings, and conclusions found to be: (B) contrary to constitutional right, power, privilege, or immunity . . . ." 5 U.S.C. § 706(2)(B).

242.    A statute or regulation is vague under the Due Process Clause of the Fifth Amendment if it "fails to provide a person of ordinary intelligence fair notice of what is permitted or, is so standardless that it authorizes or encourages seriously discriminatory enforcement."

243.    Put another way, the Due Process Clause demands regulated parties know what is required of them so they may act accordingly and requires the precision and guidance necessary so those enforcing the law do not act in an arbitrary or capricious way.

244.    As alleged above, the Altered Regulations fail to provide a person of ordinary intelligence fair notice of what is permitted or forbidden.

245.    ATF's arbitrary, capricious, and selective enforcement of the Altered Regulations establishes the Altered Regulations' ambiguity.

246.    ATF has permitted the continued manufacture and sale of the Tac-Con 3MR (forced reset) trigger, despite its similar function to the FRT-15.  Indeed, ATF has taken the position the 3MR trigger is not a "machinegun" under the NFA or GCA.

247.    ATF's applications of the Altered Regulations to RBT underscore their ambiguity, the ATF's arbitrary and capricious application of the Altered Regulations to RBT and ATF's lack of confidence in the enforceability of the Altered Regulations and/or ATF's own confusion concerning them.

248.    In its Cease-and-Desist Letter to RBT, ATF felt compelled to change the Altered Regulations' usage of "single pull of the trigger" to "single **continuous** pull" to make enforcement of the Altered Regulations sound plausible against RBT.

249.    Beyond its selective enforcement regarding the 3MR trigger, ATF has also selectively enforced the Altered Regulations with respect to RBT.  ATF has an obligation to refer alleged violations of the law to the DOJ for prosecution, yet ATF has not done that with RBT or with Lawrence DeMonico, who was found in possession of thousands of "machineguns" under ATF's claimed classification.

250.    Instead, ATF has engaged in serial harassment and badgering of RBT and 3rd Gen Inc., RBT's primary manufacturer, to simply drive them out of business and done everything to avoid a head-on criminal prosecution where the classification of the FRT-15 would be put to a true and unrestricted test by a court of law.

251.    The Altered Regulations are void for vagueness under the Due Process Clause of the Fifth Amendment.

252.    The illegitimate Altered Regulations are the claimed legal basis for ATF's (mis)classification of the FRT-15 as a "machinegun" and the issuance of the Cease-and-Desist Letter, both of which ATF claims are final agency actions.

253.    RBT has suffered legal wrongs and have been adversely affected by the actions taken by Defendants' reliance on and enforcement of the Altered Regulations.

254.    RBT will be irreparably harmed by the continued enforcement of the Altered Regulations, ATF's misclassification of FRT-15, its issuance of the Cease-and-Desist Letters, the harassment and terrorization of RBT's manufacturers, dealers, and customers and its seizure of RBT's property.

255.    The FRT-15 is not a "machinegun" under the NFA or GCA.

WHEREFORE, pursuant to 5 U.S.C. §§ 706(2)(B), RBT respectfully requests that the Court grant all appropriate relief, including:

    a.  An order vacating the Altered Regulations;

    b.  An order vacating the Cease-and-Desist Letter to RBT, and vacating ATF's classification of the FRT-15 as a "machinegun" and the corresponding administrative record;

    c.  A declaratory judgment, pursuant to the Declaratory Judgment Act (28 U.S.C. § 2201-02) or other applicable law, finding that ATF's classification of the FRT-15 as a "machinegun" is unlawful and unenforceable, that the FRT-15 does not constitute a "machinegun" under the NFA or the GCA, that Defendants lack the authority to expand or otherwise amend the definition of "machinegun" under the NFA and/or the GCA;

d.  An award of attorneys' fees and costs to Plaintiffs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A), and any applicable statute or authority; and

e.  Any other relief that this Court in its discretion deems just and proper.

## COUNT VI
## VIOLATION OF SECTION 706 OF THE APA – ARBITRARY AND CAPRICIOUS

256.    RBT realleges each allegation in paragraphs 1 through 194 above as if fully set forth herein.

257.    Pursuant to 5 U.S.C. § 702, any person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

258.    Pursuant to 5 U.S.C. § 704, final agency action is reviewable by the District Court.

259.    Pursuant to 5 U.S.C. § 706: "To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706(2)(A).

260.    Further, "[t]he reviewing court shall - . . . (2) hold unlawful and set aside agency action, findings, and conclusions found to be - (A) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

261.    ATF's alleged final agency action, whether it be the decision to classify the FRT-15 as "machinegun," the Cease-and-Desist Letter, or both, violate Section 706(2)(A) in the following non-exclusive ways:

a.  These actions were based upon a predetermined and/or politically driven outcome.

b.  These actions were based upon an incomplete investigation and excluded technical data on RBT's publicly available website and did not solicit or include participation in the investigation by RBT or review of the RBT's four expert's opinions that the FRT is not a "machinegun" under applicable law.

c.  These actions were based upon an investigation that relied on unverified blogs and websites from unknown sources with unknown credentials, if any credentials at all.

d.  These actions were based upon an investigation that relied on a patent for a trigger that was not the FRT-15 or owned by RBT, and ATF intentionally failed to review the patent for the FRT-15 knowing that it would not support its desired position that the trigger is a "machinegun."

e.  These actions were based upon an investigation that relied on factors that Congress did not permit the agency to consider, including without limitation, focusing on analyzing whether the FRT-15 is a "machinegun" on a "single pull of the trigger" versus a "single function of the trigger," the latter being the definition in the NFA and GCA.

f.  These actions were based upon a "zip-tie test" performed by ATF that is invalid and a *per se* nullity because the addition of the zip-tie to the firearm constituted the addition of a "part" under 26 U.S.C. § 5845(b), directly resulting in the creation of a "machinegun" similar the addition of a well-placed rubber band or shoelace.

g.  The actions were based upon a "zip-tie test" that is unreliable, not generally accepted in the firearms expert community, bereft of technical merit, and easily manipulated by the tester to achieve what result the tester prefers.

h.  These actions were based upon a "zip-tie test" which failed to establish the FRT-15 was installed in the firearm during the test.

i.  These actions were contrary ATF's previous finding that forced reset triggers, like the FRT-15, are not "machineguns" and to ATF's continuing position that forced reset trigger, other than the FRT-15, are not "machineguns" although all operate using substantially similar mechanisms.

j.  These actions are arbitrary, discriminatory and deny RBT equal protection of the laws because ATF has allowed similar forced reset triggers, including the Tac-Con 3MR, to remain on the free market with no harassment, seizures, or threat of prosecution.

k.  These actions were based upon knowingly false statements made in the examination report, which render both actions unworthy of credence or the slightest deference.

l.  ATF intentionally failed to notify RBT of the examination or classification decision prior to issuing the Cease-and-Desist Letter so ATF could close the administrative record before RBT could respond to ATF's faulty and false examination report and demonstrates ATF's actions and conclusions were arbitrary, capricious, and not supported by fact or law.

m.  The Cease-and-Desist Letter is arbitrary, capricious, and not in accordance with the law because it added to the Altered Regulations' definition the word

"continuous," which word is not found in the Altered Regulations' definition of "machinegun." Neither ATF nor other federal agency is free to add words to a regulation's definition to justify a final agency action.

262.    For these reasons, ATF's alleged final agency action concluding the FRT-15 trigger constitutes a "machinegun" and the resulting Cease-and-Desist Letter are arbitrary, capricious, without supporting evidence in the administrative record, and an abuse of the agency's discretion.

263.    ATF's alleged final agency action was purportedly based upon its interpretation of the Final Rule.

264.    Based, *inter alia*, on the foregoing, ATF's alleged final agency action must be vacated.

WHEREFORE, pursuant to 5 U.S.C. §§ 706(2)(A), RBT respectfully requests that the Court grant all appropriate relief, including:

a.   An order vacating the Cease-and-Desist Letter to RBT, and vacating ATF's classification of the FRT-15 as a "machinegun" and the corresponding administrative record;

b.   A declaratory judgment, pursuant to the Declaratory Judgment Act (28 U.S.C. § 2201-02) or other applicable law, finding that ATF's classification of the FRT-15 as a "machinegun" is unlawful and unenforceable, that the FRT-15 does not constitute a "machinegun" under the NFA or the GCA, that Defendants lack the authority to expand or otherwise amend the definition of "machinegun" under the NFA and/or the GCA;

    c.   An award of attorneys' fees and costs to Plaintiffs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A), and any applicable statute or authority; and

    d.   Any other relief that this Court in its discretion deems just and proper.

**COUNT VII**
**VIOLATION OF SECTION 706 OF THE APA –CONTRARY TO CONSTITUTIONAL RIGHT - THE FIFTH AMENDMENT'S DUE PROCESS CLAUSE – NO PROCEDURAL DUE PROCESS**

265.    RBT realleges each allegation contained paragraphs 1 through 194 above as if fully set forth herein.

266.    Pursuant to 5 U.S.C. § 702, any person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

267.    Pursuant to 5 U.S.C. § 704, final agency action is reviewable by the District Court.

268.    Pursuant to 5 U.S.C. § 706: "To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706(2)(A).

269.    Further, Section 706 requires courts to "hold unlawful and set aside" agency action that is "not in accordance with law" or in "contrary to constitutional right, power, privilege or immunity." 5 U.S.C. § 706(2)(B).

270.    Defendants are obligated to provide notice and an opportunity to be heard to RBT because U.S. agency action which deprives a person of liberty or property requires the fundamental protections of due process under the Fifth Amendment. *Morgan v. United States*, 304 U.S. 1, 14-

58

15 (1938) ("in administrative proceedings of a quasi-judicial character the liberty and property of the citizen shall be protected by the rudimentary requirements of fair play . . . [and] these demand 'a fair and open hearing,' -- essential alike to the legal validity of the administrative regulation and to the maintenance of public confidence in the value and soundness of this important governmental process").

271.     Such procedural due process requires both notice and a *meaningful* opportunity to be heard.  *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) (emphasis added).

272.     While pre-deprivation due process is not always required, there must at least be a prompt post-deprivation hearing with proper notice.  *See Mackey v. Montrym*, 443 U.S. 1, 13 (1979).

273.     So far as the notice requirement is concerned, it is "[a]n elementary and fundamental requirement of due process in *any* proceeding which is to be accorded finality [to receive] notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action *and afford them an opportunity to present their objections*."  *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) (emphasis added) (internal citations omitted).

274.     The notice <u>must</u> convey the required information, and it <u>must</u> afford a reasonable time for those interested to make their appearance.  *Id*.

275.     In this case, Defendants failed to provide any notice or opportunity to be heard to RBT prior to taking the purported final agency action of the finalizing the classification report or issuing of the Cease-and-Desist Letter on July 26, 2021, and thus there was no post-deprivation due process.

276.    Subsequent to the issuance of the Cease-and-Desist Letter, Defendants called RBT in for meeting but failed to advise the RBT the purpose or subject of the meeting.  Thus, RBT was not given a fair and open hearing.  Further, because ATF had purported to close the administrative record the day *before* giving notice to RBT, RBT was completely deprived of any opportunity to present evidence or testimony to the administrative record, and RBT was deprived of any opportunity to respond to ATF's report which was not provided to RBT until August 12, 2021 – more than two weeks *after* the administrative record was closed.

277.    Neither at that meeting nor after that meeting did the Defendants give RBT any notice of when it could appear in this matter, when and where they could submit evidence or testimony to be included in the administrative record, or what the time frame would be for such submissions, and any claim of post-deprivation due process was severely defective.

278.    As a result, the RBT's due process rights and their rights to a fair and impartial hearing have been violated.

279.    After the procedural dismissal of the Florida Case on Oct 28, 2021, RBT submitted to ATF via a November 2, 2021, registered letter, all the exhibits objected to by the Defendants at hearing on the basis that they could not be submitted to the administrative record because the Florida Case was pending.

280.    In spite of this submission and a follow-up letter to the ATF on December 21, 2021, RBT has received no direct reply as to that submission and no notice of its inclusion in the administrative record of this case.

WHEREFORE, pursuant to 5 U.S.C. §§ 706(1) and (2)(A), RBT respectfully requests that the Court grant all appropriate relief, including:

a.  An order vacating the Cease-and-Desist Letter to RBT, and vacating ATF's classification of the FRT-15 as a "machinegun" and the corresponding administrative record;

b.  Alternatively, directing ATF to give proper notice of when and where RBT can appear in this matter, submit their evidence and testimony in the administrative record, and a reasonable time frame in which to do so and directing the ATF to reconsider its decision in light of such submissions;

c.  An award of attorneys' fees and costs to Plaintiffs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A), and any applicable statute or authority; and

d.  Any other relief that this Court in its discretion deems just and proper.


_s/s JOSEPH BLITCH_                                    s/s _KEVIN C. MAXWELL_
**JOSEPH BLITCH**                                      **KEVIN C. MAXWELL**
Florida Bar No. 40592                                  Florida Bar No.: 0604976
9100 Conroy Windermere Rd., Ste 200                    255 Primera Blvd. Ste 160
Windermere, Fl. 34786                                  Lake Mary, FL 32746
Tel (407) 574-2853                                     Tel. (407) 480-2179
jblitch@bwesq.com                                      kevin@kmaxwellesq.com
**Attorney for Plaintiff**                             **Lead Attorney for Plaintiff**